## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY



2001 JUL 14   A  9: 46

| | |
|---|---|
| Vincenza Leonelli-Spina<br>2186 Linwood Ave<br>Fort Lee, New Jersey 07024<br>Tel: 201.914.5550<br>Appellant Pro Se | Case No. 09-cv-01864 (PGS) |
| In re: Vincenza Leonelli-Spina<br>aka<br>Vincenza Spina, | Sat Below:<br>Honorable Morris Stern |
| JAMES R. ALBRO,<br><br>        Plaintiff-Respondent,<br>v.<br><br>VINCENZA LEONELLI-SPINA aka<br>VINCENZA SPINA,<br><br>        Defendant-Appellant. | Chapter 11<br><br>Case No. 07-26097 (MS)<br>Adv. Proc. 08-1070 (MS) |

---

## BRIEF ON BEHALF OF APPELLANT
## VINCENZA LEONELLI-SPINA

---

On the Brief:
     Vincenza Leonelli-Spina

## **TABLE OF CONTENTS**

Table Of Authorities .................................................................................ii

Statement Of The Basis Of Appellate Jurisdiction .......................................1

Statement Of The Issues Presented On Appeal ...........................................1

Standard Of Review ...............................................................................2

Statement Of The Case ...........................................................................3

     A.    Nature of the Case .......................................................................3

     B.    Procedural History .......................................................................4

Statement Of The Facts ...........................................................................5

The Bankruptcy Court  Decision ...............................................................17

Legal Argument

     I.  THE   BANKRUPTCY   COURT   ERRED   IN   NOT
        REVIEWING THE UNDERLYING RECORD AND NOT
        GRANTING A HEARING ON THE ISSUE OF WHETHER
        COLLATERAL ESTOPPEL APPLIES TO THIS
        ADVERSARY PROCEEDING .......................................................18

     II.  THE   BANKRUPTCY   COURT   ERRED   IN   NOT
         REVIEWING  THE  RECORD  IN  THE  STATE  COURT
         ACTION SINCE THE STATE COURT'S DECISION WAS
         AGAINST THE WEIGHT OF THE EVIDENCE .............................28

     III. THE   BANKRUPTCY   COURT   ERRED   IN   NOT
         REVIEWING  THE  RECORD  IN  THE  STATE  COURT
         ACTION   SINCE   THE   AWARD   FOR   PUNITIVE
         DAMAGES  WAS  AGAINST  THE  WEIGHT  OF  THE
         EVIDENCE AND WAS PREMISED ON ERRONEOUS
         FACTS ...................................................................................36

Conclusion ...........................................................................................41

i

## __TABLE OF AUTHORITIES__

### __CASES__

Baker v. National State Bank, 312 N.J. Super. 268 (App. Div. 1998),
    affirmed, 161 N.J. 220 (1998) .................................................................37

Belinski v. Goodman, 139 N.J. Super. 351 (App. Div. 1976) ....................37

First Indem. Of Am. Ins. Co. v. Modular Structures
    (In re Modular Structures), 27 F.3d 72 (3d Cir. 1994) ....................2

Fischer v. Johns-Manville Corp., 103 N.J. 643 (1986) ...........................37

Graham v. IRS (In re Graham), 973 F.2d 1089 (3d Cir. 1992) .................3

Herman v. Sunshine Chemical Specialties, Inc., 133 N.J. 329 (1993) ..........37

In re Combustion Engineering, Inc., 366 F.Supp.2d 224 (D.N.J. 2005) ........2

In re Estate of Dawson, 136 N.J. 1 (1964) ......................................19

In Re Graham, 973 F.2d 1089 (3d. Cir. 1992) ...................................18

In Re Himowitz, 162 B.R. 109 (Bankr. 3rd Cir. 1993) .........................20,21

In Re Nugent, 254 B.R. 14 (Bnkr. 3d. 1998) ....................................18

In Re Ross, 602 F.2d 604 (3d. Cir. 1979) ...................................1,3,17,18

In re Sharon Steel, 871 F.2d 1217 (3d Cir. 1989) ...............................2

J.P. Fyfe, Inc. v. Bradco Supply Corp., 891 F.2d 66 (3d Cir. 1989) ............2

Kool, Mann, Coffee & Co. v. Coffey, 300 F.3d 340 (3d Cir. 2002) ..............2

Labree v. Mobil Oil Corp., 300 N.J. Super. 234 (App. Div. 1997) .............28

Lederman v. Prudential Life Ins. Co. of America, 385 N.J. Super.
    324 (App. Div. 2006) ..........................................................28

Levinson v. D'Alfonso & Stein, 320 N.J. Super. 312 (App. Div. 1999) .........28

Lyme Disease Treatment Center v. Horizon Blue Cross Blue Shield,
    301 B.R. 662 (Bankr. 3rd Cir. 2003) .........................................19

McCormac v. Qwest Communications Int'l, Inc., 387 N.J. Super. 469
    (App. Div. 2006). ................................................................................... 28

McDonough v. Jorda, 214 N.J. Super. 338 (App. Div. 1986),
    certif. denied, 110 N.J. 302 (1988) ....................................................... 37

Mellon Bank, N.A. v. Metro Commec'n, Inc., 945 F.2d 635
    (3d Cir. 1981) ......................................................................................... 2

Moreira Construction Co. v. Moretrench Corp., 97 N.J. Super. 391
    (App. Div. 1967) ................................................................................... 30

Olivieri v. Y.M.F. Carpet, Inc., 186 N.J. 511 (2006) ..................................... 19

Pace v. Kuchinsky, 347 N.J. Super. 202 (App. Div. 2002) ................... 19,26,27

Pavlov v. Mint Management Corp., 375 N.J. Super. 397 (App. Div. 2005) .......... 36

Perth Amboy Iron Works, Inc. v. American Home Assurance Co.,
    226 N.J. Super. 200 (App. Div. 1988), affirmed, 118 N.J. 249 (1989) ........... 37

Pivnick v. Beck, 326 N.J. Super. 474 (App. Div. 1999) ................................ 19

Rosen v. Bezner, 996 F.2d 1527 (3d Cir. 1993) ........................................... 3

Rudbart v. North Jersey District Water Supply Commission,
    127 N.J. 344 (1992) .............................................................................. 30

Schlumberger Res. Mgmt. Services v. CellNet Data Sys.
    327 F.3d 242 (3d Cir. 2003) ................................................................... 2

Selective Ins. Co. v. McCallister, 327 N.J. Super. 168 (App. Div. 2000) ........... 19,26

Smith v. Whitaker, 160 N.J. 221 (1999) ..................................................... 37

Tarr v. Bob Ciasulli's Mack Auto Mall, Inc., 390 N.J. Super. 557
    (App. Div.), certif. granted, 192 N.J. 72 (2007). .................................... 36

United States v. United States Gypsum Co., 333 U.S. 364 (1948) ................... 2

Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98 (3d Cir. 1981) ........... 2

Wade v. Park View, 25 N.J. Super. 433 (Law. Div.), aff'd.,
    27 N.J. Super. 469 (App. Div. 1953) ...................................................... 30

Zolfo, Cooper & Co. v. Sunbeam-Oster Co., 50 F.3d 253 (3d Cir. 1995). ........... 3

## STATUTES

11 U.S.C. § 523(a) ......................................................................... 1

11 U.S.C. §523(a)(2)(A) ................................................................ 18

11 U.S.C. § 523 (a)(2)(B) .............................................................. 17

11 U.S.C. §523(a)(4) ...................................................................... 18,21

28 U.S.C. § 158(a) .......................................................................... 1

N.J.S.A. 2A:13-4 ............................................................................. 15,25,28

N.J.S.A. 2A:15-5.9 .......................................................................... 36

N.J.S.A. 2A:15-5.12(c) .................................................................... 37

N.J.S.A. 2A:15-5.14 ........................................................................ 36

## RULES

Fed R. Bankr. P. 8001(a) ................................................................ 1

Fed. R. Bankr. P.  8013 .................................................................. 2

R. 1:21-6(b) ...................................................................................... 15,25,28

Rule 4:5-8 .......................................................................................... 28,29

R. 4:9-2 .............................................................................................. 29

RPC 1.4 .............................................................................................. 15,25,28

RPC 1.5 .............................................................................................. 15,25,28

## OTHER

Black's Law Dictionary, 338 (8th ed. 2004) .................................. 22

## STATEMENT OF THE BASIS OF APPELLATE JURISDICTION

The District Court has jurisdiction over the within appeal pursuant to 28 U.S.C. § 158(a) which provides that "on an appeal the district court . . . may affirm, modify or reverse a bankruptcy judge's judgments, orders or decrees or remand with instructions for further proceedings. See also Fed R. Bankr. P. 8001(a).

In the instant case, the bankruptcy court granted summary judgment to Appellee James Albro (hereinafter "Albro") based upon the equitable doctrine of collateral estoppel on his claim that the debt allegedly owed to him by Appellant Vincenza Leonelli-Spina (hereinafter "Spina" or "Debtor") is nondischargeable under 11 U.S.C. § 523(a).

## STATEMENT OF THE ISSUES PRESENTED ON APPEAL

1.     Whether the bankruptcy court erred as a matter of law when it summarily concluded that the doctrine of collateral estoppel applied based solely upon state court judgment without examining / reviewing the state court record and without conducting a hearing as mandated by In Re Ross, 602 F.2d 604, 608 (3d. Cir. 1979)?

2.     Whether the bankruptcy court erred when it failed to review the record in the state court action since the state court's decision was against the weight of the evidence?

3.     Whether the bankruptcy court erred in not reviewing the record in the state court action since the award for punitive damages was against the weight of the evidence and was premised on erroneous facts?

## STANDARD OF REVIEW

Pursuant to Fed. R. Bankr. P. 8013, the District Court may "affirm, modify or reverse a bankruptcy judge's judgment, order or decree or remand with instruction for further proceedings."

In bankruptcy appeals, questions of law are subject to plenary review and the bankruptcy court's legal conclusions are accorded no deference. First Indem. Of Am. Ins. Co. v. Modular Structures (In re Modular Structures), 27 F.3d 72, 76 (3d Cir. 1994); Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 102 (3d Cir. 1981); In re Combustion Engineering, Inc., 366 F.Supp.2d 224 (D.N.J. 2005).

A bankruptcy court's findings of fact shall not be set aside unless clearly erroneous. J.P. Fyfe, Inc. v. Bradco Supply Corp., 891 F.2d 66, 69 (3d Cir. 1989). A finding is "clearly erroneous" when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed. Schlumberger Res. Mgmt. Services v. CellNet Data Sys. 327 F.3d 242, 244 (3d Cir. 2003) (citing United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948)).

Where mixed questions of law and fact are presented, the appropriate standard must be applied to each component of the appeal. "Ultimate facts" always have a "legal concept with a factual component," thus, plenary review is used in interpreting legal precepts and its application of those precepts to the facts of a case. In re Sharon Steel, 871 F.2d 1217, 1223 (3d Cir. 1989); Mellon Bank, N.A. v. Metro Commec'n, Inc., 945 F.2d 635, 642 (3d Cir. 1981).

Exercises of discretion are reviewed utilizing an abuse of discretion standard. Kool, Mann, Coffee & Co. v. Coffey, 300 F.3d 340, 353 (3d Cir. 2002). A bankruptcy judge abuses his discretion when he fails to apply the proper legal standard or to follow proper procedures in

2

making a determination or base an award on facts that are clearly erroneous.  Zolfo, Cooper & Co. v. Sunbeam-Oster Co., 50 F.3d 253, 257 (3d Cir. 1995).

In this case, the Bankruptcy Court granted Albro's summary judgment and concluded that the State Court judgments had preclusive effect in the nondischargeability action.  The Bankruptcy Court's decision was based on issues of law and, therefore, is subject to plenary review by this Court.  Rosen v. Bezner, 996 F.2d 1527, 1530 (3d Cir. 1993) (decision as to summary judgment is matter of law); Graham v. IRS (In re Graham), 973 F.2d 1089, 1093 (3d Cir. 1992) ("Our review of preclusion issues is plenary.").

## STATEMENT OF THE CASE

### A.    Nature of the Case

This appeal relates to an Order entered on March 16, 2009 in which the Bankruptcy Court summarily determined that Spina is precluded from defending the debt as a result of a judgment entered in the State Court matter entitled James Albro vs. Vincenza Leonelli-Spina, Docket No. BER-L-1277-04 (hereinafter "the State Court Judgment").  In concluding that the debt was nondischargeable based solely on the State Court Judgment, the Bankruptcy Court ignored the law which provides that prior to ruling that collateral estoppel applies, **the bankruptcy court must review the entire record of the underlying proceeding. This review of the record is followed by a hearing where the parties are permitted to present testimony and evidence.** In Re Ross, 602 F.2d 604, 608 (3d. Cir. 1979).  No such review occurred.  The Bankruptcy Court simply relied on the State Court Judgment to make its determination. Thus, the Bankruptcy Court erred as a matter of law.

**B.      Procedural History**

Appellant Vincenza Leonelli-Spina filed a voluntary petition for relief under Chapter 13 with the Bankruptcy Court on November 1, 2007. Case No. 07-26097, Docket No. 1. By Order dated April 17, 2008, Spina's bankruptcy proceeding was converted to a Chapter 11 case. Case No. 07-26097, Docket 91. By Order dated September 15, 2008, the Plan of Reorganization was confirmed. Case No. 07-26097, Docket No. 177. By Order dated April 6, 2009, the Final Decree was entered. Case No. 07-26097, Docket 255.

On January 18, 2008, Albro commenced an adversary proceeding against Spina in the Bankruptcy Court. Case No. 08-01070, Docket No. 1. Albro sought to have his claim against Spina determined to be nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(B).

On January 15, 2009, Albro moved for summary judgment against Spina based upon the collateral estoppel effect of the State Court Judgment. AA 000002[1]: AD, Item No. 1[2]. In support of his motion, Albro relied solely on the State Court Judgment rather than any reference to the underlying record. Spina opposed the motion by, among other things, asserting that summary judgment was inappropriate since the Bankruptcy Court must review the entire record from the State Court Action and schedule a hearing thereafter. AA 000091: AD, Item No. 2.

On March 16, 2009, the Bankruptcy Court granted summary judgment to Albro based solely on the State Court Judgment. AA 000321: AD, Item No. 4. The Bankruptcy Court refused to review the entire record and refused Spina's right to a hearing. AA 000336: AD, Item No. 7.

On March 24, 2009, Spina filed a Notice of Appeal from the Bankruptcy Court's March 16, 2009 Order to the United States District Court. AA 000324: AD, Item No. 5.

---

[1] AA 000--- refers to the Appellant's Appendix which is a courtesy copy of the Designation of the Record on Appeal that has been forwarded to Judge Sheridan in accordance with the Clerk's Quality Control Message.

[2] AD, Item No. 0- refers to Appellant's Designation of the Record on Appeal.

## STATEMENT OF THE FACTS

If the bankruptcy court had reviewed the entire record of the underlying state court action and / or Spina had been afforded a hearing, she would have had the right to present evidence regarding why collateral estoppel should not apply to the action. Spina can establish the following facts that rebut Albro's claim that collateral estoppel applies to the dischargeability action:

**A.    Albro Retains John J. Feczko Under A Contingency Fee Agreement.**

Albro was a patrol officer in the Borough of Paramus from 1969 through 1995, when he applied for and received an early retirement package. AA 000120: AD, Item No. 2. After retirement was approved, Albro changed his mind, attempted to withdraw his application, and requested reinstatement to the force because he was facing a risky surgical procedure. AA 000121: AD, Item No. 2. When Paramus refused to reinstate him, Albro retained John J. Feczko, Esq. ("Fezcko") to represent him. AA 000121; AA 000147: AD, Item 2 - Exhibit B (P9:14 to 16). Feczko assigned Spina, an associate employed by his firm, to handle the matter. AA 000121; AA 000147: AD, Item 2 - Exhibit B (P9:21 to P10:6). Albro's stated purpose in retaining counsel was to be reinstated to the police department. AA 000121; AA 000147: AD, Item 2.

Feczko did not have Albro sign a retainer agreement. Albro testified that he believed Feczko agreed to take the case on a one-third contingency fee agreement. AA 000121; AA 000149: AD, Item 2 - Exhibit B (P10:7 to P11:14). On cross-examination, Albro affirmed his testimony that during the first meeting, Feczko agreed to take the case on a contingency fee basis:

> Q.    Your arrangement with Mr. Feczko, your understanding of
>        that is it was a contingency fee arrangement?

> A.    That is correct.

AA 000121: AD, Item 2 - Exhibit B (P109:9 to 12). Albro also confirmed on cross-examination that in his deposition he testified specifically that Feczko would receive one-third of any settlement.

> Q.    And in your deposition testimony you indicated that you thought Mr. Feczko was going to receive approximately a third of the settlement, correct?
>
> A.    Yes.

AA 000121: AD, Item 2 - Exhibit B (P111:7 to 11). Albro's trial testimony was drastically different. For the first time, he alleged that while she was employed by Feczko, Spina told him that Paramus would pay his legal fees, and that is how Feczko would be paid.

> Q.    Did Ms. Spina tell you early, on at the first meeting that you referred to that the Borough of Paramus would be paying your attorney's fees?
>
> A.    That's correct.

AA 000122; AA 000157: AD, Item 2 - Exhibit B (P28:23 to P29:1).

This testimony was contrary to Albro's own expert's opinion. Edward T. Rogan, Esq. authored a report on behalf of Albro wherein he stated that "the contentions of the parties over the type of fee arrangement between them form the nub of the their dispute." AA 000122; AA 000264: AD, Item 2 - Exhibit M. Mr. Rogan's entire report centered around the allegation that Albro believed that Spina was representing him on a contingency fee basis. AA 000122; AA 000264: AD, Item 2 - Exhibit M. Notably, Mr. Rogan was not called to testify at trial because his testimony would have conflicted with Albro's newly concocted theory of his case that the underlying action was a fee shifting case.

**B.  Spina Opens Her Own Firm And Albro Admittedly Signs A Retainer Agreement Setting Forth That Spina Is To Be Paid Hourly.**

In 1996, Spina left Feczko's employ and opened her own firm. AA 000122; AA 000154: AD, Item 2- Exhibit B (P23:20 to 23). Albro retained Spina to continue to represent him in the action against Paramus. AA 000122; AA 000156: AD, Item 2-Exhibit B (P25:13 to 15). Contrary to his trial testimony, Albro set forth in his pre-trial brief that he "always understood that defendant Spina would continue to handle the case on a contingency fee basis." AA 000122; AA 000168: AD, Item 2-Exhibit C. Albro's wife confirmed that she believed that Spina agreed to represent Albro "on a contingency fee." AA 000122; AA 000171: AD, Item 2- Exhibit D (P6:24 to P7:2).

Given their stated belief that it was a contingency fee arrangement, neither Albro could adequately explain why, on December 4, 1996 (the month that Spina opened her own firm), Albro executed a Retainer Agreement setting forth the terms of an hourly fee agreement with Spina. AA 000180: AD, Item 2 - Exhibit E.  It is admittedly Albro's original signature on the Retainer Agreement.  The Retainer Agreement specifically authorizes Spina to utilize funds from a Pension Escrow Account to pay her attorneys' fees and costs on an hourly basis.

> 4. COMPENSATION & COSTS: The client hereby agrees to pay the Law Firm for Legal Services at the rate of $250.00 per hour, with the understanding that John Feczko will be paid at a rate of $250.00 per hour.  Any work or meetings in which both attorneys are involved shall be billed at a rate of $475.00 per hour.
> ...
> The Law Firm will send the Client itemized bills from time to time.  All such bills shall be paid by the Pension Retirement Account which the law firm is authorized to utilize for legal fees, costs and expenses.  In the event there is no money in the Pension Retirement Account, the client will be billed directly for legal fees, costs and expenses.  The Client will also be charged interest at the yearly rate of 12 % on any balance due that is not paid within thirty (30) days from the date of the bill.
> ...

11. COMPLETE AGREEMENT: This writing includes the entire Agreement between the Client and the Law Firm regarding this matter. This Agreement can only be modified with another written Agreement signed by the Client and the Law Firm. This Agreement shall be binding upon both the Client and the Law Firm and their respective heirs, legal representatives and successors in interest.

...

13. DATE: This Agreement is effective on the 4th day of December, 1996. This Agreement incorporates the prior retainer agreement entered with the law offices of John Feczko, Esq. The client agrees to honor all attorneys liens imposed by the law offices of John Feczko.

AA 000180: AD, Item 2 - Exhibit E is Retainer Agreement.

Further, Albro acknowledged that he did in fact sign the hourly retainer agreement.[3] Albro's excuse for not recalling the specific contents of the document was that he "was not wearing his glasses."

Q.    You did not read the document is what you are saying?

A.    That is correct.

Q.    You didn't have your glasses to read the document?

A.    Yes.

AA 000122; AA 000159: AD, Item 2 - Exhibit B (P74:L2-7). According to Albro's version of events, he never requested to see the entire Agreement. Nor did he inquire why he was signing an Agreement clearly indicating an hourly rate and providing for payment of fees from the pension account. Indeed, Albro admits that he signed the last page of the document, which clearly states:

---

[3] Albro's allegations have been contradictory and ever evolving. At his deposition, Albro denied signing the retainer agreement. After a handwriting expert unequivocally concluded it was Albro's signature on the retainer agreement, Albro then admitted he signed the document, but he denied knowing what it said because he did not bother to put on his glasses.

> Both the Client and the Law Firm read and agreed to this Agreement. The Law Firm has provided the Client with answers to any questions and further explained this Agreement to the complete satisfaction of the Client. The Client has also been given a copy of this agreement.

AA 000122; AA 000182: AD, Item 2 - Exhibit E. Albro's explanation is nonsensical. How was Spina to know that Albro did not read the retainer agreement.

The state court found that the signature was "fraudulent induced" but failed to detail any factual basis for the ultimate conclusion that Spina "fraudulently induced" Albro to sign the retainer agreement. Albro failed to provide any evidence as to how he was fraudulently induced. He never testified that he was pressured into signing the agreement. His sole testimony concerning the retainer agreement was that he did not read the document because he did not have his glasses. Albro cannot point to <u>anything</u> in the record to support the state court's finding that he was fraudulently induced to sign the retainer agreement. Critically, he never asserted a claim that he was fraudulently induced to sign the document until after testimony was closed.

While Spina was employed by Feczko, an escrow bank account was opened with Feczko as the trustee for the deposit of Albro's pension checks. Feczko remained trustee of the account from the date of opening in 1996 through the end of 1998 (two years after Spina opened her law practice). On April 15, 1996, immediately after opening the account, Albro used funds to pay taxes for the year 1995. Albro personally prepared a check in the amount of $8,704.00 to the Internal Revenue Service and personally prepared a check in the amount of $2,089.00 to the New Jersey Department of Treasury. Albro also used the escrow funds to loan money to family members, pay legal fees and make charitable contributions.

Pursuant to the Retainer Agreement, Spina sent bills to Albro and withdrew money from the escrow account. For almost two of those years, Feczko was the escrow agent and received

9

the bank statements. On direct examination, Feczko testified unequivocally that he reviewed the bank statements in the ordinary course (and thus would have seen the checks written to pay the legal fees). He confirmed his regular review on cross-examination.[4]

### C.    Settlement of the Underlying Action <u>Albro v. Paramus</u>.

The litigation between Albro and Paramus lasted for over seven years and was hotly contested. On September 4, 2001, the underlying matter was settled for the remaining limits of Paramus's insurance policy. AA 000124; AA 000184: AD, Item 2- Exhibit F. Pursuant to the terms of the settlement, Albro received the following:

- $501,640.44 from Paramus
- $172,000 from the Division of Pensions
- a retroactive promotion from patrolman to police captain
- an increase in his monthly pension check of $2,000 per month for the remainder of his life (and / or his spouses wife, whichever is later)
- enhanced medical and dental benefits.

AA 000124; AA 000159; AA 000164: AD, Item 2 - Exhibit B (P131:10 to 15), Exhibit F and Exhibit G.

The net present value of Albro's total settlement, including future pension benefits, was approximately $1,200,000.00. AA 000124; AA 000159: AA 000194: AD, Item 2 - Exhibit I (P26:8 to 12). The gross value of the settlement was $1,500,000.00. AA 000124; AA 000194: AD, Item 2. Albro was so proud that he wanted to frame the settlement check. AA 000122; AA 000161: AD, Item 2 - Exhibit B (P107:1 to 11).

---

[4] When called as a rebuttal witness, Feczko's recollection was different. Suddenly, he remembered that he might not have reviewed the bank statements sent to his attention at his office. 12T-101:22 to 103:23. Even if his contradictory and self-serving testimony were true, Spina could not predict that Feczko would not review account statements directed to his attention and that indicated payment of her fees from the account for more than two years.

**D. Spina Billed Albro In Accordance With The Terms Of The Written Retainer Agreement.**

Prior to the settlement in <u>Albro v. Paramus</u>, and in accordance with the Retainer Agreement, Spina billed Albro by the hour and withdrew money from the Pension Escrow Account to pay her fees. Spina testified that the bills were kept in the ordinary course. This was confirmed by Allan Roth, Esq., adverse counsel for Paramus. AA 000125; AA 000205: AD, Item 2-Exhibit I (P72:21 to P73:2). Specifically, Mr. Roth testified that he requested copies of bills, that copies were produced during settlement discussions, and pivotally, that Spina told him directly that she was being paid hourly. AA 000125; AA 000205: AD, Item 2-Exhibit 1 (P76:14 to 17). Patrick Spina, Esq. testified that he had discussions with Albro and Spina about their hourly fee agreement, as well as, the balance due on account at the time of the settlement. AA 000125: AD, Item 2-Exhibit I Exhibit H (P14:24 to P15:13).

Lieutenant Walter Wehrhahn, who testified on Spina's behalf, also identified bills that he received from Spina during her representation. Spina identified worksheets that she prepared and relied upon to prepare Wehrhahn's bills utilizing the Timeslips billing program, and explained how each entry is assigned a slip number. A snapshot comparison of number entries on the Wehrhahn worksheets correlates directly to the number entries on plaintiff's worksheets.

On May 1998 worksheets, when there were entries for the same date, they also directly correlate with the Albro entries:

| Date | Slip # for Albro | Slip # for Wehrhahn |
|------|------------------|---------------------|
| 5/5/98 | #304 | #303 |
| 5/25/98 | #91 | #92 |
| 5/27/98 | #95 | #94 |

AA 000125: AD, Item 2.

11

At trial, Albro claimed that Spina's fees were unreasonable. Albro, however, did not personally dispute even one billing entry. Albro was the primary litigant in the underlying action, and the only named plaintiff herein. Albro admittedly handled the vast majority of communications with Spina, and was practically a fixture in her office. Yet Albro did not testify that any of Spina's billing entries were incorrect. He never testified that: (1) he did not meet with Spina on a day she said he did; (2) that he did not communicate with Spina on a day she said they did; or (3) that he did not regularly insist that Spina prepare for depositions or other appearances with him over the course of several days. The central litigant, and only plaintiff in this case, never disputed the work that was performed.

Instead, Albro's wife speculated about meetings or telephone calls of which she had no personal knowledge. One glaring example is Mrs. Albro's testimony that Albro could not possibly have attended a meeting with Spina in May 1998 because Albro had "spinal surgery" and was on bed rest afterwards. AA 000125; AA 000176: AD, Item 2-Exhibit D (P62:14 to P63:22). Albro actually had an epidural injection, not spinal surgery. AA 000126; AA 000210: AD, Item 2- Exhibit J. The medical records presented also prove that Albro was not on bed rest (as testified by his wife), and that the epidural did not even prevent him from receiving chiropractic treatment on May 4, 1998 at an office near Spina. AA 000126; AA 000213: AD, Item 2- Exhibit K.

Mrs. Albro also speculated about Spina's actions in situations where she had no personal knowledge. She testified that Spina could not have worked on the day of the Albros' daughter's wedding because Spina attended the reception. AA 000126; AA 000174: AD, Item 2- Exhibit D (P56:18 to P58:5). Spina's telephone records prove she was at the office for hours earlier in the day. The trial court summarily dismissed Spina's records (including phone calls to Spina's

mother) calling the proof "weak." AA 000126; AA 000225: AD, Item 2- Exhibit L (P10).  The trial court did not elaborate on the type of proof that would be required to prove that Spina worked on the underlying matter on that date.

To rebut Mrs. Albro's sheer speculation, Spina presented competent expert testimony regarding the reasonableness of her fees.  Spina's expert testimony was uncontroverted because Albro withdrew his expert after Spina filed a motion to bar his testimony as net opinion.  Spina's expert, Gianfranco A. Pietrafesa, Esq., is a practicing attorney who served four years on a Fee Arbitration Committee.  Mr. Pietrafesa served one year as vice chair, and two years as chair of his Committee. AA 000126; AA 000198: AD, Item 2- Exhibit I (P4:23 to 24).

After reviewing Spina's entire file in the underlying action, Mr. Pietrafesa opined that the fee indicated on Spina's billing records, approximately $333,000, was reasonable. AA 000126; AA 000199: AD, Item 2- Exhibit I (P7:17 to 21).  As he testified, she did a significant amount of work. (P8:23 to P9:22).  He also analyzed the fee in relationship to the contingency fee that Albro claimed was applicable prior to trial.  Considering the enhanced pension, Mr. Pietrafesa concluded that a contingency fee would have been approximately $394,573, More than Spina received pursuant to the hourly fee arrangement. AA 000127; AA 000202: AD, Item 2- Exhibit I (P11:7 to 14).

### E.    Spina Paid Albro's Taxes When Directed to Do So By Albro.

As the documentary evidence indicates, the Albros were well aware that they were having tax issues and at a certain point undertook to resolve those issues themselves.  Albro's allegations regarding the tax payments are belied insofar as he entered into a settlement with the Internal Revenue Service ("IRS") on April 12, 2001 to make $300 monthly payments on his outstanding taxes until they were paid. Albro entered into this settlement without consulting

13

Spina, the person who was presumably responsible for paying the taxes or his accountant of 15 years prior to entering into the settlement.

There is also no question that Spina did, in fact, make certain tax payments on Albro's behalf **anytime that Albro requested that she make such payments from the escrow account**. Specifically, in April 1996, two checks were issued to the IRS and State of New Jersey. No claim was made for this period. In 1997, Spina issued ten checks for payment of taxes to the IRS and State of New Jersey. In 1998, Spina issued two payments to the IRS and State of New Jersey in the amount of $100.00 and $3,000.00.     In April of 1999, Spina made four payments to the IRS and State of New Jersey. This is the first year that Albro claims Spina allegedly failed to pay his estimated taxes. In April 2000, Spina issued two checks. One to the IRS in the amount of $830.00. A second to the State of New Jersey in the amount of $849.00. In January and February of 2001, Spina issued two checks to the State of New Jersey in the amount of $2,460.00 and $70.73, respectively. The first was sent by Certified Mail to the attention of a collection agency at the request of Mrs. Albro, but only after Spina had negotiated an abatement. The second was mailed to the collection agency by regular mail.   No other tax payments were made.

The Albros admit that Spina was not expected to make tax payments in 2002. Yet, according to their accountant, they were assessed penalties by the IRS in 2002 in the amount of $3,011.42.

In yet another inconsistency, the court asked Albro directly how many vouchers he brought to Spina for payment of estimated taxes. He indicated **four  vouchers.** In reality, if Albro was expecting Spina to pay estimated taxes to the IRS and State of New Jersey, he would have had to bring eight vouchers. For the years that Spina made a primary tax payment, he

would have had to bring ten total. Clearly, there was no consistent pattern of payments that could result in a breach of contract.

F.    **The State Court Ignored The Uncontroverted Evidence, *Sua Sponte* Amended the Complaint At Trial And Ruled In Albro's Favor.**

Albro filed a four count Verified Complaint against Spina in State Court. AA 000127; AA 000304: AD, Item 2- Exhibit O. In the First Count, Albro alleged that Spina failed to pay his taxes from the pension escrow account and that Spina's fees in the underlying action were to be limited to the $165,000.00 set forth in the Consent Judgment. In the Second Count, Albro alleged that Spina failed to provide him information regarding her trust account in violation of N.J.S.A. 2A:13-4. In the Third Count, Albro alleged that Spina violated R. 1:21-6(b) by failing to keep accurate accounting records. _Finally, in the Fourth Count, Albro alleged that Spina violated RPCs 1.4 and 1.5. Albro did not allege that Spina perpetrated a fraud on her or converted his funds.

Spina filed a motion for summary judgment seeking the dismissal of Albro's legal malpractice claims against her. In her July 21, 2006 decision, the Honorable Sybil R. Moses, A.J.S.C. ruled that Albro's claim was for breach of contract and dismissed the legal malpractice action. AA 000127; AA 000296: AD, Item 2- Exhibit N (P21-23). Specifically, the trial court performed a careful and extensive review of Mr. Albro's Verified Complaint. After such review, the court determined that the only issue left to be determined through the bench trial was the reasonableness of Spina's fees: "The only issue is the reasonableness of the legal fees and did he understand them. Since I can't find a duty other than that which she successfully completed, there can be no breach." AA 000127; AA 000299: AD, Item 2- Exhibit N (P24). Thus, the trial

that followed in this matter was tried by Spina to establish the reasonableness of the attorneys fees, not fraud, fraudulent inducement, conversion or breach of fiduciary relationship.

On September 10, 2007, Judge Moses rendered her findings of fact and conclusions of law after a bench trial. AA 000127; AA 000216: AD, Item 2- Exhibit L. In the ruling, the court ignored her previous ruling that the only remaining claims sounded in breach of contract and, *sua sponte*, amended the Verified Complaint to include claims for fraud and misappropriation of funds. AA 000128; AA 000222: AD, Item 2- Exhibit L (P7-8). The court held that Albro met his burden of proof on all of his claims primarily relying on the mistaken fact that Spina told Albro that Paramus would pay his attorneys' fees and costs and fraudulently induced him to sign the Retainer Agreement. The trial court ignored the fact that Albro's testimony on this issue was inconsistent to say the least. The trial court failed to identify how Spina fraudulently induced Albro to sign the retainer agreement. In concluding that the fees were excessive, the trial court "pointed out" that Spina would have had to have worked 10 hours for 160 days to bill the amount of hours that she billed. The court ignored the fact that the litigation took 7 years (not 160 days) to complete and Spina averaged less than 19 hours a month on a case that resulted in a 1.5 million gross payout for Albro.

The decision of the Honorable Estela M. De La Cruz, J.S.C. to award plaintiff attorneys' fees, costs and punitive damages generates directly from two factors (1) Judge Moses's erroneous decision and (2) Judge De La Cruz's highly prejudicial (and incorrect) assumption in which she took "judicial notice" that Spina was disbarred due to the Albro matter.[5]

---

[5] Spina was not disbarred because of the Albro matter. The disbarment was based upon a matter entitled Mazzarella. The matter was not commenced by Mazzarella, Mazzarella was never a grievant, nor did Mazzarella ever lose any money. In fact, Mazzarella testified on Spina's behalf at the ethics hearing. The matter was commenced by the OAE after an exhaustive review of Spina's financial records dating back to 1996. Mazzarella's funds were stolen by Spina's bookkeeper who walked away with over $58,000 in ill gotten gains, a new mortgage on her home based upon documents the bookkeeper forged. As a result of employing this thief and not realizing what was going on at the time, Spina admitted that she failed to safeguard the Mazzarella funds.

## THE BANKRUPTCY COURT DECISION

On March 16, 2009, the bankruptcy court granted summary judgment to Albro on his claim under § 523 (a)(2)(B). (hereinafter "the bankruptcy court decision"). In granting summary judgment to Albro, the bankruptcy court relied upon the opinions of the state court actions and afforded the actions collateral estoppel effect precluding Spina from challenging the allegations in the nondischargeability complaint. Having determined that the state court judgment collaterally estopped Spina from relitigating the claims, the bankruptcy court reviewed the decision of the state court and found that the decision sufficiently plead the elements of a dischargeability claim. The bankruptcy court speculated as to the portion of the judgment sounding in breach of contract for failing to pay taxes and summarily determined that that portion of the judgment was also nondischaregeable. The bankruptcy court refused to consider the fact that the state court judge at the punitive hearing, penalized Spina for what she considered to be a bad faith bankruptcy filing, even though the bankruptcy court had already determined that the Chapter 11 had been filed in good faith.

The bankruptcy court refused to review the underlying state court record or to grant Spina a hearing as required by In Re Ross, 602 F.2d 604, 608 (3d. Cir. 1979). Instead, the bankruptcy court held that the state court decision illustrated that Spina had gotten her opportunity to litigate the merits and as such collateral estoppel was appropriate.

For the foregoing reasons, the bankruptcy court erred in granting Albro summary judgment, thus the undersigned asks that this Court reverse same.

## LEGAL ARGUMENT

### POINT I

**THE BANKRUPTCY COURT ERRED IN NOT REVIEWING THE UNDERLYING RECORD AND NOT GRANTING A HEARING ON THE ISSUE OF WHETHER COLLATERAL ESTOPPEL APPLIES TO THIS ADVERSARY PROCEEDING.**

Pursuant to 11 U.S.C. §523(a)(2)(A), a debt is not dischargeable in bankruptcy if it is the product of "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."  Further, 11 U.S.C. §523(a)(4) states that a debt is not dischargeable if it is obtained through "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  While collateral estoppel may apply to dischargeability actions, ultimately it is the bankruptcy court that determines whether the debt is dischargeable.  In Re Graham, 973 F.2d 1089, 1095-1096 (3d. Cir. 1992).  Further, prior to ruling that collateral estoppel applies, the bankruptcy court must review the entire record of the underlying proceeding.  In Re Ross, 602 F.2d 604, 608 (3d. Cir. 1979).  This review of the record is followed by a hearing where the parties are permitted to present testimony and evidence.  Id.  The Third Circuit also noted that the trial and appellate records of the underlying matter should be reviewed prior to making a determination that collateral estoppel applies.  Id. at 608 fn. 10.  See also In Re Nugent, 254 B.R. 14, 29 (Bnkr. 3d. 1998).

It is well settled law that when determining whether to give a state court judgment preclusive effect, federal courts will look to the issue preclusion law of the state where the judgment was entered.  Id. at 22.  Insofar as the judgment against Spina was entered in New Jersey, New Jersey collateral estoppel law applies to plaintiff's motion for summary judgment. Under New Jersey law, the party invoking the collateral estoppel doctrine must prove that:

> (1) the issue to be preclude is identical to the issue decided in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the court in the prior proceeding issued a final judgment on the merits; (4) the determination of the issue was essential to the prior judgment; and (5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding.

Olivieri v. Y.M.F. Carpet, Inc., 186 N.J. 511, 521 (2006)(quoting In re Estate of Dawson, 136 N.J. 1, 20-21 (1964)).  Further, "even where these requirements are met, the doctrine, which has its roots in equity, will not be applied when it is unfair to do so."  Pace v. Kuchinsky, 347 N.J. Super. 202, 215 (App. Div. 2002).  See also Lyme Disease Treatment Center v. Horizon Blue Cross Blue Shield, 301 B.R. 662, 681 (Bankr. 3rd Cir. 2003) ("Even if the elements of collateral estoppel were established on this record, the application of the collateral estoppel doctrine is discretionary and to be applied equitably, not mechanically.")

The factors that favor application of collateral estoppel are "conservation of judicial resources; avoidance of repetitious litigation; and prevention of waste, harassment, uncertainty and inconsistency."  Selective Ins. Co. v. McCallister, 327 N.J. Super. 168, 174 (App. Div. 2000) (quoting Pivnick v. Beck, 326 N.J. Super. 474, 485 (App. Div. 1999)).  The factors that disfavor application of collateral estoppel are that:

> the party against whom preclusion is sought could not have obtained review of the prior judgment; the quality or extent of the procedures in the two actions are different ; it was not foreseeable at the time of the prior action that the issue would arise in a subsequent litigation; and the precluded party did not have an adequate opportunity to obtain a full and fair adjudication in the prior action.

Pace v. Kuchinsky, 347 N.J. Super. 202, 216 (App. Div. 2002).

Here, Albro's motion should have been denied because he failed to provide the bankruptcy court with the entire record of the underlying action and sought to deprive Spina of

19

her right to a hearing on the issue of whether collateral estoppel should apply.  Further, there is an issue regarding whether the issues of fraud and misappropriation of funds were properly litigated in the underlying action because Judge Moses, *sua sponte*, amended Albro's Verified Complaint to include those claims after the trial was completed.

Through his motion for summary judgment,  Albro sought to deprive Spina of her right to have the bankruptcy court review the entire record of the underlying action and to present evidence at a hearing regarding whether collateral estoppel should.  In In Re Himowitz, 162 B.R. 109, 111 (Bankr. 3rd Cir. 1993), plaintiff Penn-America Insurance Company (Penn) successfully prosecuted an action against Michael L. Himowitz, and his corporation, for breach of contract, conversion of funds, unjust enrichment, fraud, and defalcation while acting in a fiduciary capacity.  Id.  Himowitz subsequently filed a Chapter 7 bankruptcy petition.  Id. at 112.  Penn filed an adversary proceeding against Himowitz seeking to have the judgment entered against Himowitz declared non-dischargeable.  Id.  In connection with the adversary proceeding, Penn filed a motion for summary judgment alleging that the factual findings and judgment against Himowitz in the underlying action constituted a final judgment and that Himowitz was collaterally estopped from relitigation of the fraud issue in the adversary proceeding.  Id.

The court denied Penn's motion holding that in order to apply the collateral estoppel doctrine it had to review the entire record of the underlying action and hold a hearing.  Id.  The court noted that "the doctrine of claim preclusion or res judicata cannot prevent the bankruptcy court from exercising its own judgment to determine if a debt is dischargeable."  Id.  The court went on to hold that it could not simply rely on the judgment entered in the underlying action, but rather it "must make a careful review of the record of the prior case.  The court cannot merely accept the stated legal conclusions of the prior court at face value."  Id.  Penn also failed

20

to provide a copy of the entire record of the underlying action for the court to review.  Id. at 113.

Finally, the court held that even if Penn provided the entire record, it is for the bankruptcy court

to determine if the facts fall within the meaning of fraud as set forth within the meaning of the

bankruptcy code.

> Even assuming, however, such evidence has been provided, this
> court is obligated by *Ross* to make its own determination as to
> whether the facts which were determined by the District Court add
> up to fraud or defalcation in the a fiduciary capacity within the
> meaning of Code section 523(a)(4).

Id.

In this matter, Albro only provided the bankruptcy court with the decisions of Judge

Moses and Judge De La Cruz.  That clearly did not meet the requirement that the entire record of

the underlying proceeding be reviewed by the court.  Further, Albro requested that that the court

apply collateral estoppel without giving Spina the benefit of the hearing to which she was

entitled.  Indeed, if the bankruptcy court reviewed the entire record and had a hearing it might

come to the conclusion that Judge Moses's decision did not comport with the evidence and

witness testimony adduced at trial, and as such, to apply collateral estoppel matter would be an

injustice to Spina.

By way of example, Judge Moses overlooked the fact that Albro repeatedly changed his

story regarding the fee agreement between himself and Spina.  During his testimony, Albro could

not explain why he agreed to sign any contract if he understood that Paramus was going to pay

his attorneys' fees and costs.  But then again, Albro's claims evolved as discovery, and even the

trial, progressed.  In his pre-trial brief, Albro asserted that he "always understood that defendant

Spina would continue to handle the case on a contingency fee basis." AA 000168: AD, Item 2-

Exhibit C (P7).  At trial, for the first time, Spina denied that a contingency fee would have

21

provided for his attorney to receive a percentage of the recovery. As illustrated on cross-examination, this testimony flatly contradicted his testimony at deposition that he thought his counsel was going to receive one-third as the contingency fee. AA 000121; AA 000163: AD, Item 2, Exhibit B (P111:7 to 11). This contention also ignored that the term "contingency fee" is a term of art used by attorneys to describe a fee arrangement wherein a percentage of recovery is paid to counsel. As a contingent fee is defined by Black's Law Dictionary, 338 (8th ed. 2004):

> A fee charged for a lawyer's services only if the lawsuit is successful or is favorably settled out of court. • Contingent fees are usu. calculated as a percentage of the client's net recovery (such as 25% of the recovery if the case is settled, and 33% if the case is won at trial).

Albro's testimony that the contingency fee was actually a fee shifting agreement with a cap not only contradicted his prior deposition testimony, but also the factual contentions set forth in his pre-trial disclosures and the opinion of the expert plaintiff identified as a witness, but later decided not to call at trial. AA 000264: AD, Item 2-Exhibit M (P3-4). If it was true, Albro would not have agreed to sign an hourly agreement at any time regarding fees.

Of course, in reality, it is not true. No one told Albro it was a contingency fee. When Albro concocted the contingency fee claim, he had underestimated how much money he actually received as part of the settlement. At first blush, the $165,000 referenced in the Consent Order for Judgment appears to be approximately one-third of the settlement (the amount received from Paramus). The fee-shifting story only evolved after Albro realized that under a contingency fee arrangement, Spina was actually entitled to significantly more than $165,000, and therefore, the contention did not make any sense. Because, in reality, plaintiff recovered not only the $500,000 payments identified in the Consent Order for Judgment from Paramus, but also $172,000 paid

directly to him from the Division of Pension for his retroactive promotion from patrolman to police captain. Specifically, he received:

| From Paramus: | $ 27,039.00 |
| | 8,981.97 |
| | 270,000.00 |
| | 30,619.47 |
| | 165,000.00 |
| Sub Total | $501,640.44 |
| From the Division of Pensions: | $172,000.00 |
| Total | $673,640.44 |

Tellingly, one-third of the $500,000 specifically indicated in the Consent Order is conveniently $165,000. Accordingly, the theory of the case had to evolve -- the contingency fee had to morph into a capped fee shifting agreement in order to avoid dismissal.

The contingency fee analysis also ignored that Albro receives at least $2,000 per month in increased pension benefits. As Spina's expert testified, the stream of income would be considered when calculating a contingency fee. Those pension benefits have a consumer price index inflator that increases their value per year. Assuming Albro's life expectancy is approximately 25 years, and ignoring that his wife would also receive enhanced monthly benefits if her husband predeceased her, the gross recovery of that income stream with the cash payments is $1,500,000. The net recovery, discounting for present value, but considering the CPI inflator, is $1,200,000. One-third of $1,200,000 is $400,000 -- significantly more than the $165,000 Albro claimed at trial was the proper fee. It is easy to see why Albro's recollection of the terms of his fee arrangement evolved over time.

At his deposition, in his pretrial brief, proposed expert report, and trial testimony, Albro testified repeatedly that he understood that Spina was representing him on a one-third

contingency fee basis. It was not until well into the trial that Albro changed his story and asserted that Spina told him during their first meeting that Paramus would pay all of her legal fees. AA 000157: AD, Item 2-Exhibit B (P28:23 to P29:1). On cross-examination, Albro conceded that at his deposition he testified differently – specifically, that he understood it was a contingency fee agreement. AA 000157: AD, Item 2- Exhibit B (P111:7-11). Despite this unexplained contradiction in testimony, the state court held that the fee agreement was one in which Paramus would pay all of Albro's fees. The court further found that Spina was limited to the $165,000 provision for fees contained in the Consent Order for Judgment. This finding is contrary to Albro's own theory of the case that Spina was representing him on a contingency fee basis. AA 000168: AD, Item 2-Exhibit C (P7). Id. By accepting Albro's revised and contrived testimony, the trial court ignored all of the evidence to the contrary.

Albro's ever changing story regarding the fee arrangement is but one of several factual issues that Judge Moses failed to consider. The trial court ignored the fact that Attorney Roth (counsel for Paramus) testified that Spina showed him her hourly bills during the underlying action, thus proving that she contemporaneously billed Albro. AA 000205: AD, Item 2-Exhibit I (P72:21-P73:2 and P76:14 to 17). Judge Moses also accepted Albro's wife's testimony regarding alleged billing discrepancies when she did not have any personal knowledge regarding the issue. AA 000173: AD, Item 2-Exhibit D (P56:18 to P58:5 and P62:14 to P63:22). Albro did not utter one word of testimony disputing Spina's billing entries despite the fact that he was constantly in contact with Spina during the underlying action. These issues and others should be subject of a hearing regarding whether collateral estoppel should be applied to this action.

The decision to ignore the fact that Albro's story regarding the fee agreement evolved over time, and the other factual discrepancies in his case, may have been influenced by the ethics

proceeding that was going on at the same time as the trial.  Based upon pre-trial motions, the trial was supposed to be a breach of contract claim in which the only issue to be decided was whether Spina's fees were reasonable. AA 000296 through AA 000299: AD, Item 2-Exhibit N (P21-24). In her opinion on Spina's motion for partial summary judgment, Judge Moses specifically held that the only issue to be tried was breach of contract based on reasonableness of the attorneys fees.

After testimony concluded, the Ethics Hearing Officer issued his decision recommending that Spina be disbarred for reasons unrelated to the Albro matter.[6]  It was only after this recommendation that the state court, *sua sponte*, amended Albro's complaint to include claims for misappropriation of funds and fraud.  Neither of these causes of action were plead in Albro's Verified Complaint.  In the Verified Complaint Albro alleged that, (1) Spina's fees were limited to the $165,000 set forth in the Consent Judgment; (2) Spina failed to pay Albro's quarterly taxes from the pension escrow account; (3) Spina failed to provide him information regarding her trust account in violation of N.J.S.A. 2A:13-4 ; (4) Spina failed to keep accurate accounting records in violation of R. 21-6; and (5) Spina failed to provide information to Albro regarding his account in violation of RPCs 1.4  and 1.5. AA 000304: AD, Item 2-Exhibit O.  No where in the Verified Complaint did Albro plead misappropriation of funds or fraud. If the state court abided by its own decision, then the underlying action would have been tried as a simple breach of contract case and the judgment against Spina would have been dischargeable.  Instead, the underlying action turned into a trial on fraud, misappropriation of funds, and violations of the RPC's which was contrary to pretrial rulings.  Now Albro seeks to have the judgment of fraud follow Spina around for the rest of her life even though he never pled it in is his Verified Complaint.

---

[6]  The Hearing Officer was eventually reversed on all matters except for the Mazzarella matter, the one  in which Spina admitted that she failed to safeguard client funds that were invaded by a bookkeeper.

As can be seen from above, Spina submits that it is essential that the bankruptcy court conduct a detailed review of the entire record of the underlying action before deciding whether collateral estoppel should apply. a hearing should be scheduled to provide Spina with the opportunity to present evidence that the judgment in the state action was unjust and the judgment is in fact dischargeable.

Refusing to apply collateral estoppel now also would conserve judicial resources. Should the Appellate Division reverse the state court's decisions in the underlying action, then the holding that collateral estoppel should apply would be adversely impacted.  One of the reasons to apply collateral estoppel is to protect judicial resources.  See Selective Ins. Co. v. McCallister, 327 N.J. Super. 168, 174 (App. Div. 2000).

Finally, one of the factors that disfavor's the application of summary judgment is that the party did not have a chance to have the judgment reviewed.  Pace v. Kuchinsky, 347 N.J. Super. 202, 216 (App. Div. 2002).  Now that a final judgment has been entered, Spina has the right to argue to the Appellate Division that the judgment should be overturned.  The underlying action was a bench trial, and as such, the only finder of fact that ruled on this case was Judge Moses.  If the underlying action was a jury trial, then the jury and the trial judge, through a motion for a new trial, would pass judgment on the facts.  In a bench trial, a motion for a new trial is not ordinarily made insofar as the same finder of fact will be asked to render a ruling on the same issues and evidence.  In this matter, Spina's opportunity to have the trial court's decision reviewed is in the Appellate Division and in this adversary proceeding.

Accordingly, plaintiff's motion should be denied and a hearing on the nondischargeability issue scheduled.  There is no case law or Court Rule that mandates that this Court apply the doctrine of collateral estoppel at this time.  Indeed, the case law sets forth just

the opposite in that collateral estoppel is an equitable doctrine that the Court, in its discretion, may apply.  See Pace v. Kuchinsky, 347 N.J. Super. 202, 215 (App. Div. 2002).  Under the current circumstances, it was patently unfair, and contrary to the applicable case law, for the bankruptcy court to grant Albro's motion.  The bankruptcy court erred when it failed to review the entire file of the state action and schedule a hearing where Spina would have been entitled to present evidence. The bankruptcy court should be instructed to take on such a review now or hold the matter in abeyance until after the Appellate Division has an opportunity to rule on Spina's appeal.  To do otherwise would be to apply an equitable doctrine inequitably and in a manner not contemplated by the relevant case law.

## POINT II

**THE BANKRUPTCY COURT ERRED IN NOT REVIEWING THE
RECORD IN THE STATE COURT ACTION SINCE THE STATE
COURT'S DECISION WAS AGAINST THE WEIGHT OF THE
EVIDENCE**

**A.     The State Court Improperly Amended Albro's Verified Complaint to Include
Claims for Fraud and Misappropriation of Funds.**

Based upon pre-trial motions, the trial was supposed to be limited to a breach of contract

claim to determine whether Spina's fees were reasonable. In the Verified Complaint, plaintiff

alleged that: (1) Spina's fees were limited to the $165,000 set forth in the Consent Judgment; (2)

Spina failed to pay plaintiff's quarterly taxes from the pension escrow account; (3) Spina failed

to provide him information regarding her trust account in violation of <u>N.J.S.A.</u> 2A:13-4 ; (4)

Spina failed to keep accurate accounting records in violation of <u>R.</u> 21-6; and (5) Spina failed to

provide information to plaintiff regarding his account in violation of RPCs 1.4  and 1.5.  Da1-10.

Albro did not plead misappropriation of funds or fraud.  "A complaint sounding in fraud,

must on its face, satisfy the requirements of Rule 4:5-8."  <u>McCormac v. Qwest Communications</u>

<u>Int'l, Inc.</u>, 387 N.J. Super. 469, 484 (App. Div. 2006).  A plaintiff is required to allege

"particulars of the wrong, with dates and items, if necessary."  <u>R.</u> 4:5-8(a).  Indeed, a "court may

dismiss a complaint alleging fraud if 'the allegations do not set forth with specificity, nor do they

constitute as pleaded, satisfaction of the elements of legal or equitable fraud.'"  <u>McCormac</u>, 387

N.J. Super. at 484-85 (<u>citing</u> <u>Levinson v. D'Alfonso & Stein</u>, 320 N.J. Super. 312 (App. Div.

1999)).  "Simply making nonparticularized allegations against the individuals does not satisfy

New Jersey's pleading requirements."  <u>Lederman v. Prudential Life Ins. Co. of America</u>, 385

N.J. Super. 324, 349 (App. Div. 2006).  Attempts to rely on vague allegations of fraud,

unsupported by the required specificity of the pleading, have been rejected.  <u>See</u> <u>Labree v. Mobil</u>

Oil Corp., 300 N.J. Super. 234, 237 (App. Div. 1997)("[N]owhere in plaintiff's complaint does any allegation of 'fraud' or 'misrepresentation' appear and plaintiff did not specifically plead the facts underlying his fraud allegation as required by Rule 4:5-8(a)). Further, plaintiff never amended the complaint to include any fraud or misrepresentation allegations. Therefore, that the 'claim sounds essentially in fraud,' as asserted by plaintiff, cannot be supported.").

While a complaint may be amended to comport to the evidence adduced at the time of trial, this amendment is done on a party's motion. R. 4:9-2. Albro never made a motion to amend his Verified Complaint to include claims for misappropriation of funds and fraud. Moreover, not only was the amendment improper, it was not supported by the evidence presented.

The trial court set forth the parameters of the trial of the underlying action when it held that it was a fee dispute sounding in breach of contract. The trial court then turned its own ruling on its head. Instead, the underlying action turned into a trial on fraud, misappropriation of funds, and violations of the RPC that was contrary to the pretrial rulings. This decision changed the whole complexion of the trial and was not in accordance with the Rules of Court.

**B.      Plaintiff Voluntarily Signed the Retainer Agreement.**

The lynchpin of the trial court's decision was that Spina was fraudulently induced to sign the hourly Retainer Agreement after the case was resolved. The factual support for that claim is baffling. It is well settled that:

> Affixing a signature to a contract creates a conclusive presumption, except as against fraud, that the signer read, understood and assented to its terms.

29

Wade v. Park View, 25 N.J. Super. 433, 440 (Law. Div.), aff'd., 27 N.J. Super. 469 (App. Div. 1953).  The New Jersey Supreme Court affirmed this principle of law in Rudbart v. North Jersey District Water Supply Commission, 127 N.J. 344, 353 (1992):

> A party who enters into a contract in writing, without any fraud or imposition being practiced upon him, is conclusively presumed to understand and assent to its terms and legal effect.

Id. Moreover, "one who does not choose to read a contract before signing it cannot later relieve himself of its burdens." Moreira Construction Co. v. Moretrench Corp., 97 N.J. Super. 391, 394 (App. Div. 1967).

Albro admittedly did not bother to read the document before signing it.  Indeed, even though the document is a critical piece of evidence, he testified at trial that he had not bothered to read it, even up to the day of his cross-examination. He admitted, though, that when he executed the Retainer, he knew he was signing a contract, but claims he did not read it because he did not have his glasses. The part that Albro did not, and cannot, explain is how he knows the document in evidence is not the document he signed if he has never read it.  That would seem to be a critical first step.

Albro also could not present factual support for a claim of fraudulent inducement.  First, he admitted that he voluntarily chose not to read the Retainer.  He did not testify that anyone pressured him into signing such an important agreement.  Critically, he did not assert a claim that he was fraudulently induced to sign the Retainer in the Verified Complaint.  The claim of fraudulent inducement only evolved after Albro was forced to concede it was, in fact, his signature -- and the claim that he never signed a retainer agreement became insupportable.

Like much of his version of events, Albro's claim that he did not bother to read the document does not make sense or comport with the documentary evidence. Albro testified that he signed a one-page document.  However, the page that contains his signature starts mid-

paragraph. He is not blind, or even legally blind, so if he had so much as glanced at the page he signed, he would have had to notice it was a multi-page document. The font on the headings is extremely large, indicating many sections, including one that specifically says "COMPLETE AGREEMENT." AA 000180: AD, Item 2-Exhibit E.

All these things should have triggered at least a quick perusal, if not careful consideration, especially since Albro did not testify about any pressure to sign or being told that he could not take the document home for review. The state court's finding to the contrary was entirely unwarranted and a miscarriage of justice.

## C.     Plaintiff's Version of Events Ever-Evolved At Trial.

Albro's claim about the fee arrangement does not comport with his testimony regarding how much he expected to receive up-front at the time of settlement. Albro was adamant that he expected to net $500,000 in cash at the time of settlement, including the money he claims was misappropriated from an escrow account:

> Q.     And wasn't it your understanding that they were recommending a settlement that, where you were going to receive approximately $500,000, isn't that correct?
>
> A.     With the escrow.
>
> Q.     It was your understanding that you were going to receive $500,000 plus the escrow?
>
> A.     No. With the escrow account. The monies that were in the escrow account. The monies that I got at settlement. It would be a little over $500,000.

In fact, Albro received exactly what he understood he received, a little over $500,000 in cash. Specifically, total cash payments as part of the settlement were at least $673,640.44. Subtracting the $165,000 contribution towards fees, the net to Albro was at least $508,640.44.

At trial, Albro claimed, and the court found, that he was entitled to a refund of $211,000. Da202. If that were the case, with the escrow funds, Albro should have been expecting to receive $719,640.44 – not $500,000. That is a substantial differential. Clearly, Albro always understood that the pension escrow account funds were utilized to pay fees, that is exactly why he never expected more than $500,000 at the time of settlement. That is also why he presented no evidence that prior to filing this action, he sought a return of funds.

It was astounding at trial that Albro alleged that he did not know how much he received at the time of the settlement. When asked if he received $500,000, he said "Not that I know of. It's a little over four." As set forth above, the arithmetic is straightforward and Albro personally received over $500,000. Going through the numbers on cross-examination, Albro was forced to concede that he knew that he actually received over $500,000:

> Q.   Does the Consent Order refresh your recollection that you really actually received closer to $500,000?
>
> A.   It's somewhere in that area. Yes. If you add it all up.
>
> Q.   That wasn't inclusive of the monies in the pension account, correct?
>
> A.   No. That's correct.

Either he never bothered to figure out what he actually received, or he intended to mislead the state court. Either way it is unconscionable.

Albro's silence for years after the settlement of the underlying state action is further evidence that he knew Paramus was not paying all of his legal fees in the underlying action. Albro contended that he was expecting to receive a refund of $211,738.46 in pension monies at the end of the case. Albro received the bulk of his monies from Paramus by the end of 2001. The case finally concluded with a promotional ceremony in September of 2002. After the ceremony, Albro and his wife vacationed with the Spinas. As of December 2003, he referred

new clients to Spina. He sent her holiday gifts. He golfed with her husband. That is not the conduct of a person who is anxiously waiting for the return of hundreds of thousands of dollars.

Albro did not present one scrap of written evidence indicating that he actually expected a return of pension funds. Despite a fax machine in his home, he did not send one letter or fax to Spina demanding his money between December 2001 and February 2004. The only letter Spina ever sent to Spina, in January 2004, limited his complaints to his tax issues – without even a post script indicating "by the way, I want my $200,000." Indeed, Albro specifically asked for an accounting of funds received and disbursed. He never asked for an accounting of funds being held by Spina after the completion of the case.

Despite this unexplained contradiction in testimony, the trial court held that the fee agreement was one in which Paramus would pay all of plaintiff's fees. The court further found that Spina was limited to the $165,000 provision for fees contained in the Consent Order for Judgment. This finding is contrary to Albro's own theory of the case -- that Spina was representing him on a contingency fee basis.


**D.      The State Court's Findings That Spina Did Not Contemporaneously Bill Were Incorrect.**

The trial court's findings as to Spina's billing entries also are not based upon any credible evidence. The court noted that Spina's fee was the equivalent of her working 1600 hours on the underlying matter. The court concluded that 1600 hours required one hundred and sixty (160) ten (10) hour days. What the court did not consider is that the underlying matter lasted for seven (7) years. In actuality, Spina spent an average of nineteen (19) hours a month on the litigation. Given the contentiousness of the litigation alone, this was not unreasonable.

Spina testified that the bills were kept in the ordinary course. This was confirmed by Allan Roth, Esq., adverse counsel for Paramus. Specifically, Mr. Roth testified that he requested copies of bills, that copies were produced during settlement discussions, and pivotally, that Spina told him directly that she was being paid hourly.

The indirect evidence also contradicts plaintiff's retrospective version of events. Lieutenant Walter Wehrhahn testified on Spina's behalf. He identified bills that he received from Spina during her representation. Spina identified worksheets that she prepared and relied upon to prepare those bills. Spina also testified regarding the Timeslips billing program that she uses and how each entry is assigned a slip number. A snapshot comparison of number entries on the Wehrhahn worksheets correlates directly to the number entries on Albro's worksheets.

**E.** **The Trial Court Ignored the Expert Testimony Presented By Spina That Her Fees Were Reasonable.**

Without ever reviewing Spina's file and her work product from the underlying action, the trial court held that her fees were unreasonable. This ruling is particularly astounding because Albro refused to dispute any billing entries personally, even though all the specifically contested entries involved communications with him. Albro was the primary litigant in the underlying matter and had the vast majority of contact with Spina, yet he did not utter one word under oath to contradict Spina's billing entries. Instead, Albro relied upon his wife to testify regarding instances of alleged inaccurate billing of which she had no personal knowledge.

To rebut Mrs. Albro's sheer speculation, Spina presented competent expert testimony regarding the reasonableness of her fees. Spina's expert testimony was uncontroverted because Albro withdrew his expert after Spina filed a motion to bar his testimony as net opinion.

After reviewing Spina's entire file in the underlying action, Mr. Pietrafesa opined that the fee indicated on Spina's billing records, approximately $333,000, was reasonable. During the seven years of litigation, Ms. Spina performed the following tasks:

- Responded to document demands;
- Prepared opposition to motion to dismiss for failure to answer interrogatories;
- Prepared answers to interrogatories;
- Prepared interrogatories and document demands;
- Prepared for and took the depositions of Mayor Generalli, Clerk Shore, Police Chief Macher, and Jenny Generalli;
- Prepared for and defended the deposition of plaintiff;
- Researched and reviewed statutes, administrative regulations, case law and other legal authorities;
- Attended numerous settlement conferences;
- Prepared a motion for summary judgment and opposed a motion for summary judgment;
- Opposed a motion for reconsideration or a stay;
- Prepared a cross-motion in aid of litigant's rights, including a request to amend the judgment;
- Prepared papers for submission to the Division of Pensions;
- Appeared before the Division of Pensions;
- Reviewed defendants' notice of appeal and researched the standard of review for appeal;
- Researched and drafted a complaint against the PBA;
- Prepared writs of execution and levy;
- Prepared a trial brief, trial exhibits, deposition excerpts and other pretrial submissions;
- Prepared for trial;
- Negotiated the settlement with the Borough of Paramus;
- Reviewed and opposed an Order to Show Cause;
- Prepared a second motion in aid of litigant's rights;
- Prepared a notice of appeal;
- Prepared the consent order for judgment;
- Participated in a number of conferences relating to the lawsuit and other matters relating to the rights and interests of plaintiff.

Mr. Pietrafesa also analyzed the fee in relationship to the contingency fee that plaintiff claimed was applicable during discovery. Considering the enhanced pension, Mr. Pietrafesa concluded that a contingency fee would have been approximately $394,573 - more than Spina received pursuant to the hourly fee arrangement.

## POINT III

**THE BANKRUPTCY COURT ERRED IN NOT REVIEWING THE RECORD IN THE STATE COURT ACTION SINCE THE AWARD FOR PUNITIVE DAMAGES WAS AGAINST THE WEIGHT OF THE EVIDENCE AND WAS PREMISED ON ERRONEOUS FACTS**

In 1995, the Legislature enacted the Punitive Damages Act (the "Act"), N.J.S.A. 2A:15-5.9, et seq., which governs the imposition of punitive damages. "The Legislature's purpose in enacting the Act was to establish more restrictive standards with regard to the awarding of punitive damages." Pavlov v. Mint Management Corp., 375 N.J. Super. 397, 403 (App. Div. 2005). The stated purpose was a significant change in law. Prior to the Act, punitive damages were intended not only to deter the defendant from repeating his or her conduct, but also to deter others from engaging in similar conduct. See Tarr v. Bob Ciasulli's Mack Auto Mall, Inc., 390 N.J. Super. 557, 568 (App. Div.), certif. granted, 192 N.J. 72 (2007). Conversely, under the Act, the purpose of a punitive damages award is to "punish the defendant and deter that defendant from repeating such conduct" and is not to be used as a deterrent to others. N.J.S.A. 2A:15-5.14. Indeed, the Tarr Court overturned an award of punitive damages because plaintiff's counsel argued to the jury that punitive damages were intended to deter the defendant and others from wrongful conduct. Tarr, 390 N.J. Super. at 568-69 (emphasis added). As the Appellate Division stated:

> An award that is enhanced to deter others who could be completely unconnected with plaintiff or defendant's wrongdoing can be viewed as a windfall for plaintiff and excessively punitive toward defendant.

Id.

It is clear then that punitive damages are not intended to be a windfall for a plaintiff and "do not compensate plaintiff for a loss sustained; their purpose is to punish a defendant for

wrongful malicious conduct and as a deterrent to such conduct in the future." Belinski v. Goodman, 139 N.J. Super. 351, 359 (App. Div. 1976). It is within the discretion of the trier of fact to award punitive damages, however, they should only be awarded in exceptional circumstances. Perth Amboy Iron Works, Inc. v. American Home Assurance Co., 226 N.J. Super. 200, 227 (App. Div. 1988), affirmed, 118 N.J. 249 (1989). The trier of fact must analyze whether to award punitive damages from the perspective of the defendant and "the amount awarded should be sufficient to serve the purpose of deterring future misconduct by defendant." Smith v. Whitaker, 160 N.J. 221, 254-55 (1999). If punitive damages are to be awarded, the financial condition of the defendant is one of the critical factors to be determined. N.J.S.A. 2A:15-5.12(c). Another important consideration is the "punishment the defendant will probably receive from other sources...." Herman v. Sunshine Chemical Specialties, Inc., 133 N.J. 329, 338-39 (1993). See also Fischer v. Johns-Manville Corp., 103 N.J. 643, 673 (1986).

In McDonough v. Jorda, 214 N.J. Super. 338, 349 (App. Div. 1986), certif. denied, 110 N.J. 302 (1988), the Appellate Division explained why the financial condition of a defendant is critical to a punitive damages analysis:

> This is so because the theory behind punitive damages is to punish for the past event and to prevent future offenses, and the degree of punishment resulting from a judgment must be, to some extent, in proportion to the means of the guilty person.

The McDonough Court vacated a $225,000 punitive damages award against the defendant because plaintiff failed to offer any evidence of the defendant's ability to pay. Id. "That lack of evidence, an essential of Jorda's burden of proof, precluded the jury from having a proper foundation to assess damages." Id. The trial court erred in failing to judge Ms. Spina's ability to pay punitive damages based upon her current financial state. Baker v. National State Bank, 312 N.J. Super. 268, 294 (App. Div. 1998), affirmed, 161 N.J. 220 (1998).

37

### A. Spina Has No Ability to Pay Punitive Damages.

On October 3, 2008, the Honorable Estela M. De La Cruz, J.S.C., held a plenary hearing on the issue of punitive damages. Notably, the court did not preside over Phase I of the trial, and as such, relied on Judge Moses's incorrect findings of fact. As a result, plaintiff's inconsistencies at the plenary hearing were not obviously apparent.

Spina's improper goal, to augment his compensatory damages, was evident from the start when his counsel argued that:

> The purpose of punitive damages is not only to punish, um, but to find some way to reimburse, if you will, um, the – victim for what she has performed.
>
> So, it's not just punishment, um, which she, is clearly is what this is provided for, but also some additional means of recompense; and that's what we seek from this Court.

This request clearly contravenes the Punitive Damages Act.

Sympathizing with Albro based on the Albros' inconsistent testimony, the court awarded Albro $350,000 in punitive damages. Judge De La Cruz specifically found that Spina was "raking" in the fees and filed for bankruptcy in an effort to avoid paying any judgment against her. "All of these factors point to a defendant who is making every attempt to avoid the statutory punitive remedy that plaintiff is entitled to by presenting a façade of poverty." This determination was not supported by the facts on record.

On November 1, 2007, Spina filed a Voluntary Petition for Bankruptcy (the "Petition"). As indicated therein, she has virtually no assets. Since that time, Spina has been disbarred in a separate matter. She no longer has the ability to practice in her chosen profession.

In its decision, the trial court penalized Spina for a bankruptcy that the Bankruptcy Court determined was filed in good faith. The Bankruptcy Court flatly rejected Albro's motion to dismiss the bankruptcy filing, and specifically held that without Mr. Spina's contributions to the

bankruptcy plan, Spina's creditors, including Albro, would receive far less money. Accordingly, Judge De La Cruz's decision to punish Spina for filing bankruptcy was contrary to the bankruptcy court's ruling that Spina's bankruptcy plan was filed in good faith.

## B. Albro's Testimony At The Plenary Hearing Contradicted His Testimony At Trial.

At the plenary hearing, Albro was allowed to rework history yet again. Throughout most of the plenary hearing, Albro and his wife claimed that as a result of Spina's actions they were financially destitute. Albro testified that the federal government took all of the settlement monies.

> When we did, ah, win our lawsuit against the Borough of Paramus, um, the Federal Government came in and took the money.

As Mrs. Albro testified, this was simply not true:

> We got a settlement from the State Pension, and we also got a settlement from the Town, which we have put into funds that we have never touched.

The government took $38,000 from the settlement proceeds for the Albros' tax liability.

Further, Albro testified that the IRS put a lien on his house because he could not pay his taxes as a result of Spina's alleged misconduct. What plaintiff failed to tell the court was that he always had access to the pension account, which is evident by his using the money to pay his taxes and make a charitable donation. Albro also claimed that as a result of Spina's actions, he had to go back to doing manual labor, however, Albro always continued to work his sprinkler irrigation company and Albro did not explain where he placed the $500,000 he received from the settlement or the fact that as a result of the settlement, he was now earning over $6,000 per month in retirement proceeds.

Spina was whip-sawed by the change in trial judges. In order to substantiate the claim that she misappropriated funds before Judge Moses, Albro alleged she needed money. In order to substantiate the claim for punitive damages, Albro alleged she was raking in fees. Notwithstanding Judge De La Cruz's obligation to review the entire trial record, her findings were inconsistent with those of Judge Moses.

In addition, Judge De La Cruz took judicial notice that Spina was disbarred due to her actions in Albro. Thus, she believed that the Supreme Court found clear and convincing evidence that Spina misappropriated and converted funds. This was not the case. Judge De La Cruz was incorrect. The disbarment was not as a result of Albro and should not have been considered by Judge De La Cruz.

It is these prejudicial erroneous assumptions that have plagued Spina because, since the entry of Judge Moses' decision, no tribunal as of yet has reviewed the underlying record to determine whether the evidence supported the findings made by the state court. It is critical that a court review:

- What evidence supports a finding of fraudulently inducing Albro to execute the retainer agreement?
- What evidence supports a finding that Spina misappropriated funds when in fact the executed retainer agreement permitted withdrawal of pension funds to pay legal fees?
- What evidence supports a finding that Spina intentionally or willfully failed to pay Albro's taxes?
- What evidence supports a finding that Spina's fees were unreasonable when the only expert who reviewed the file testified that the fees were, in fact, reasonable?
- What evidence supports a finding that Spina's billing entries were fabricated when the only person with actual knowledge (Albro) failed to dispute any entry?
- What evidence supports a finding that Spina fabricated bills when in fact her adversary in the underlying case testified that bills were given to him during the pendency of the underlying case?
- What evidence supports a finding that the Albro debt is nondischargeable as a matter of law?

## **CONCLUSION**

For all the foregoing reasons, Debtor Spina respectfully requests that this Court reverse the Bankruptcy Court Order dated March 16, 2009, and remand the matter for further proceedings consistent with In Re Ross, 602 F.2d 604, 608 (3d. Cir. 1979).

Dated: July 9, 2009

Vincenza Leonelli-Spina, Appellant pro se